May it please the Court, I'm Victor Halton, counsel for Ivan Galvan. Contrary to Supreme Court precedent, the state courts in this case concluded that the exclusion of the gang expert testimony offered by the defense was harmless error. That conclusion is contrary to the Supreme Court's decision in Skipper v. South Carolina. The state court, both the state court on direct appeal, the third DCA, and then the state habeas court on the initial round of habeas proceedings in this case, concluded that that testimony would have been cumulative. The conclusion in that regard was supported by the courts adverting to the fact that Mr. Galvan himself and a boyhood friend of Mr. Galvan's testified at trial that if one Norteno associate or member snitches or identifies others, implicates others in a crime, that they could or that their families could face lethal retaliation. Similarly, the boyhood friend of Mr. Galvan's testified to that effect, Anthony Esquivel. Now, to characterize proffered testimony from a gang expert who's been recognized by the California Department of Justice as an expert on gang issues dealing specifically with Nortenos, to characterize that as cumulative is directly at odds with what the Supreme Court said. Don't you have to show prejudice? I mean, it would seem to me, I'm sitting on a jury. This happens. I'm saying, look, the guy, sure, he'd be threatened. You put on this expert that he's threatened. I would say, okay, I'm facing life in prison, and what am I going to do? I'm going to move my family. I'm going to tell them that I'm going to have to do what I have to do and get them out of there, and I'm going to tell my lawyer who these people are. So first, my lawyer can try to get evidence to show that it was someone else without me divulging it. But to say, okay, I'm going to be a stand-up guy. I'm going to take the rap for these two other guys. I'm not going to divulge who they are because something bad can happen to me. I don't know that the jurors are going to be too impressed. You have to show a probability that the case would have come out otherwise if you had this expert. Right? Well, let me try to respond to your point. I agree. I would, if I were in that situation facing an LWOP sentence, and I knew who did it, I would identify them. You would do that. But neither you nor I are Ivan Galvin. Neither you nor I are a Norteno gang member or associate. We didn't get beaten into this gang and go through the rituals that are involved in that. We haven't lived that lifestyle. That's why the California Supreme Court, in three cases that I've cited in my opening brief, and contrary to what every court to address this issue has said thus far, has said that this type of issue is beyond the common kin of lay jurors. We let gang members. Well, Norteno has testified for him that that's what would happen, blood in, blood out, right? He testified to that effect. Anthony Esquivel was not a Norteno. Well, but didn't he testify that that's what would happen to that gang? He himself, Anthony Esquivel. Correct. Excuse me, Ivan Galvin did. But that's exactly what happened. Did Esquivel corroborate it? Yes, but as soon as he did, sort of. I mean, the counsel for the co-defendant asked Mr. Esquivel, well, couldn't you face dire consequences if you were to implicate another Norteno? And Esquivel says, well, I suppose so, I assume. And the judge immediately rejoins, well, we're in the area of speculation. You still get back to this thing where the jurors are looking at it and they say, look, he'd be threatened, he'd be harmed in jail, his family could be harmed, but is he going to take the risk to do that, to save himself from life without parole? And the jurors are more, you're going to have to say that most of the jurors would have said, oh, if the expert says that, notwithstanding the fact that he showed the gun to somebody before the robbery, that he had the gun in his proximity 45 minutes after the robbery, and that he was identified by one of the Anas brothers, that nevertheless, because he won't divulge who really did it, will quit. You have to say that's probably going to happen. I don't have to say that's probably going to happen, because this issue that I'm raising is being not raised in the IAC context. I mean, there's a little overlap here, but I'm taking on right now my first issue, which is the issue that the trial court erred in excluding this evidence, and it was a messed up way in which the trial court excluded this evidence. Defense counsel at the tail end of the case proffered the gang expert, then the gang expert's ill on the day that he was to hit the stand, and then the trial court denied a continuance. The state court, as the district court recognized, treated that as error, basically. I mean, without saying so, it just went straight on to the Chapman harmless error analysis. So I don't have to show on this point that probably not. I have to show that there was an error. There was an objectively unreasonable or contrary to Supreme Court precedent harmless error analysis conducted by the third DCA on direct review or the state habeas courts. And I can because of Skipper v. South Carolina. And we have exact ---- Which you have to show the error and that the error prejudiced the defendant. And that's really what Judge Moskowitz was talking about, I think. There was the other evidence that pointed to the defendant's guilt. And a jury could say, well, I can understand, if they'd have heard the expert, they could have said, yeah, I can understand why this person would not identify the other two. But then let's suppose that he would have said who they were, would it have really made any difference in light of the other evidence that showed that he was the person that was really guilty of the crime? Right. And I do have to address that. And that's what's been so frustrating about this case, is that the courts on direct appeal and state habeas have said, well, this is an overwhelming evidence of guilt against Mr. Galban. Well, what is that evidence? The testimony of the Annis brothers, cross-racial identification testimony, where two guys are pulling up to a little gas station where there's been a, they don't know, but there's guys coming out with guns. These two guys say they're peripherally looking at the Hispanic guys coming out with guns, that they're a little bit. Weren't they found with the shotgun that was linked to the shooting in the car that was identified? Not a shotgun, two handguns. The guns that were used in the shooting were found in Mr. Galban's, the car he was riding in. Right. Mr. Galban admitted that the one gun was his and the other gun was his co-defendant Acuna's. There was no dispute about that. They had been with the other two actual perpetrators, as we characterized them, earlier in the day out by the Sacramento River down in the Delta area, shooting the guns, drinking beer. Mr. Galban testified to that. You know, sitting here listening to you say that just fills me with skepticism about that story. Anyway, I mean, even if you took us throughout the exclusion of the gang expert and, I mean, that story is inherently unbelievable. But is it, Your Honor? I mean, it's four 18-, 19-year-old kids in a car. They're gang members. They were seen with two, right? They had eyewitnesses that saw the two or three. No. That's where the eyewitness testimony is all over the place. One of the Annis brothers on the day of the incident tells police officers that he saw four Hispanic males. Mr. Galban's testimony at trial was that there were four. And then the Annis brothers get into court and testify that there were only three Hispanic males there. Maybe one was in the car. Mr. Galban's testimony was there were a total of four of us. Two of us stayed in the car. Me and Akuna stayed in the car. The other two that actually did this went in the gas station. We thought they were just going in to go buy beer. They apparently took our guns and did this shooting. Well, where did Galban say he placed the gun before they went to go to the gas station? He didn't say he placed it anywhere. He said that one of the others had placed it, who had shot it, had placed it under, I believe the testimony was, under the front passenger seat. So it's his gun. He shows it to somebody before the robbery. He then picks up these two people, two other gang members. They're hanging around shooting guns, and they get in the car, and those people don't give him his gun back? They go to a ‑‑ early in the day they go to a liquor store, which is near a park. As you mentioned, he showed to his friend, Anthony Esquivel, that this is a gun I recently acquired. Anthony Esquivel parts company with them. The four of them go down to the Delta area and fire shots. I don't see anything. No, they fire the shots, and when they're done firing the shots. Get back in the car. And what happens with Mr. Galban's gun at that point? It's under the front passenger seat. Who puts it under the front passenger seat? One of the individuals who ultimately does the shooting. Who's sitting in the front passenger seat? Well, at the time, it was apprehension, Galban, right? Galban was in the back seat, according to his own testimony, and I believe that that was the only evidence on the seating arrangement within the vehicle that was adduced at trial. But to what Judge Wardlaw was saying in terms of the story being so improbable, I really don't know. I'm trying to work through that. We're trying to work through it to see if it is. What happens to Galban's gun after the shooting? He doesn't get it back? No, the police recovered it immediately. No, no, before they get to the place where the homicide occurs. He doesn't get the gun back? No, it's just sitting in the car. Okay, and so then they come to this place. Mini station. Pardon me? This mini mart or gas station. Right, they come to the mini mart. And the two guys, according to Galban, the two guys who we won't mention, get out. And without Galban knowing, they take his gun. They go in. They murder the clerk. They come back in the car. And without him knowing, they put the gun back underneath his seat. They then drive off, and 45 minutes later, when they're going to the location of Acuna's mother-in-law, right? Because it's Acuna's mother-in-law's car, right? It is, yes. And so just when it takes about 45 minutes to get from there, they let these guys out. Drop them off at the liquor store they were at earlier in the day. And then go to where they get detained and apprehended. And at that point, the gun is actually, when the police come, the gun is actually underneath the car on the passenger side, right? Right. And then Acuna has the other one, or the other one is proximate to Acuna. Both guns were used in the murder. Correct. Well, I believe the other one. Well, both guns were linked to the mirror. By ballistics, either the shells being there or the bullet in the deceased. So somehow, Galvin doesn't get his gun back after the target practice. Doesn't know that they took it in and did a murder with it. Doesn't know where it is because he didn't get it back. But when he gets stopped, he can make a decision like that to take the gun out of the car and put it underneath the car. Well, I mean, the testimony at trial was not all that detailed on whether he knew where it was at all the particular points along the way. To answer your question. I mean, to make his testimony credible, wouldn't he have to fill in all those blanks? And he didn't. I don't know that he has to fill in all those blanks. Without the blanks, it doesn't seem like a credible story. And there's all this contrary evidence in the record that links him. I mean, the eyewitness, the car license plate that he and Acuna, I guess, were found in the car. The guns were found, the physical evidence linking to the shooting. All the evidence is the identification evidence, the guns being in the car at the time they were arrested, and he's got some money in his pocket. The fact that he's got money in his pocket is no big deal. Well, him and Acuna have about the same, about $50 each. Well, they don't have the exact same amount. It's several dollars off, and at least there's evidence that Galvin's employed. I don't know that there's evidence that Acuna is employed. But the significance of that they have a similar amount of money is that they split up the loot from the robbery. Sure. That's the inference that the prosecutor argued for the jury to draw, and that's certainly, I mean, that evidence cuts both ways. That's not the most impressive piece of evidence. I mean, the gun evidence, I agree, is significant. Galvin does not dispute, and like you said, the ballistics evidence tied his gun, I'm not sure about Acuna's gun, to the actual homicide. But I don't see the implausibility of a bunch of kids going out shooting guns at the American River. I'm sure that happens all the time. And then, I mean, there are, in the record, there's not a whole lot of detail about when he knew exactly where the gun was. Does it happen all the time that kids go out shooting at the American River? Well, kids, unfortunately, go out shooting with guns all the time, and particularly kids that are involved in gangs. But he didn't know these people very well, right, according to his testimony? Well, he didn't identify them. He knew who they were. They were associated with his gang. There wasn't a whole lot of detail about. He wouldn't go there in his testimony. He relinquishes control of his gun, and he doesn't know where it is, is what concerns me. That just doesn't make any sense. Maybe to you as a rational judge. Thank you. I hope they got that on the record. Not everybody thinks that. We have to take this kid, an 18-year-old, immature guy who's associated with a gang. Maybe he thinks it's cool to be loosey-goosey with his gun. That's not that improbable. I think that my time is up. I guess I've already gone 15 minutes. All right. Thank you, Ken. Ms. Warwick. May it please the Court, I'm Tammy Warwick. I represent the Respondent Appelli, Warden Ayers. The evidence against Mr. Galvin was overwhelming. The Court has already alluded to that. But in sum, Mr. Galvin admitted he was at the crime scene. One of the witnesses, Christopher Annis, positively identified him as one of the men running from the store after the shooting occurred. He was found. It was later apprehended in the car that was identified as the getaway car. The gun was found. The guns that were linked to the crime were found in the car. And Mr. Esquivel, a witness, had testified earlier that day he had seen Mr. Galvin in the getaway car and also that Mr. Galvin had showed him one of the guns involved with the incident. Although Mr. Galvin claimed that there was two other men that were the actual shooters, he never identified them to his attorney or to the court or during trial, and he admitted he was a member of a gang. Even if he wasn't the actual shooter in this case, even if a jury could have reasonably concluded he was not the actual shooter, there was still overwhelming evidence linking him to the crime, and under a felony murder, he would have been convicted of the crime. The fact that he didn't ---- Well, that's only if he knew that they were going to do a robbery. Correct, Your Honor, but the evidence would be very difficult for ---- I think it's very unlikely any jury would conclude he didn't know what was ---- These were members of the same gang. It was his gun. He was in the getaway car. And interesting enough that the failure to investigate claim involved two witnesses who had seen apparently either four or five individuals earlier in the day, and these two individuals were scared of this group, and the group had come into a gas station where Joshua Powell was and had made a racial comment, and Mr. Powell's statement to the investigator included that he was scared of these men. He knew as soon as he heard of the shooting it was them because it was close by and that the four men should hang for doing this. The young girl who also saw the men, approximately four or five men, said that she was walking and she was scared because these men pulled up alongside of her and asked her if she wanted a ride. So even if that had been presented as petitioner ---- these witnesses had presented, the fact of the matter is the number of individuals isn't as relevant as the evidence that links Mr. Galvin to that crime. There was no dispute as far as or there was no actual evidence as to how many men were there. There was two or three by the prosecution's eyewitness account, and that wasn't highlighted. The defense counsel highlighted it during closing argument, but the prosecutor argued that no matter how many individuals were involved, if he participated in the robbery and murder, he was guilty. So again, no prejudice on that point. And the only comment I will make about the gang retaliation evidence is that it was presented. As the district court found, it's not a novel concept of gang retaliation. Arguably, the expert would have bolstered that testimony, but I think the jury could have concluded that on their own. And it was not controverted at trial about retaliation. But the fact of the matter is that Mr. Galvin was claiming that there were other shooters, and he never identified those or gave his attorney any chance to bolster that defense at trial by informing him of that fact two weeks before the trial. Is there evidence of how much money was in the cash drawer at the convenience store to begin with? I don't recall there being any evidence in the trial court record about that. Unless there are any further questions, respondent will submit. Okay. Thank you, counsel.  We will take a subpoena versus mock.
judges: Thompson, Wardlaw, Moskowitz